UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at Covington

| | | |
|---|---|---|
| TERESA THORNTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:24-cv-000168-SCM |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| SFC GLOBAL SUPPLY CHAIN, INC., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Getting fired is hardly pleasant.  It is far less so after receiving unwelcome advances from one coworker and getting into an altercation with another.  Still, not every bad experience in the workplace is actionable in court.  The Plaintiff, Teresa Thornton, contends that her sexual harassment and retaliation claims ought to go before a jury.  But because she cannot support all of the elements of her claims, there is no genuine issue of material fact for the jury to decide.  The Defendant, SFC Global Supply Chain, Inc., is therefore entitled to summary judgment.  Thus, the Defendant's Motion for Summary Judgment, [Dkt. 20], shall be granted.

## I.   Facts

Taken in the light most favorable to the Plaintiff, the facts are as follows. Teresa Thornton is a woman who began working for SFC as a Machine Operator in Florence, Kentucky on or about February 6, 2024.  [Dkt. 1-1, State Court Record, at 2].  During her week-long job onboarding, Thornton received or was shown a copy of the Defendant's Culture Code, which contained the Defendant's workplace policies

relating to harassment and discrimination. [Dkt. 20-2, Thornton Deposition, at 53–54; Dkt. 20-3, Culture Code Information]. Those policies noted that harassment, discrimination, and retaliation were prohibited and explained the channels through which employees could report harassment or discrimination to the proper decisionmakers. [Dkt. 20-3 at 8–10]. These channels gave the employee discretion about whom they could report harassment or discrimination to. The options included discussing concerns with a supervisor, making a report to a human resources employee, or calling a dedicated anonymous phone line maintained for the purpose of facilitating such reports. [*Id.*].

The Plaintiff was also shown a company policy document relating specifically to harassment, which instructed employees that "reports of inappropriate conduct should immediately be reported to a human resources representative or the ethics line." [Dkt. 20-5, Company Policy, at 4; Dkt. 20-2 at 59] (emphasis omitted). The Defendant has a "zero tolerance" policy for "aggressive[]" physical contact between employees, and any hostile physical contact is "grounds for termination." [Dkt. 20-4, Walker Deposition, at 24].

Shortly after the Plaintiff's first week of employment and orientation, a male trainer named Juan Solitaire started making unwelcome sexual advances on the Plaintiff during work, including making inappropriate comments ("you're so pretty, can I have a kiss[?]" and "you have a big butt"), suggestive requests (saying "kiss me, kiss me" after "pull[ing] me on the side" of the production line, "asking me to go in his car," and "try[ing] to rub my hands"), and touching the Plaintiff's bottom "maybe

2

twice." [Dkt. 20-2 at 40, 46, 64, 68]. The Plaintiff rebuffed Solitaire's advances, but he continued his behavior for about two weeks or more. [Dkt. 20-2 at 64–65].

On March 7, 2024, after Solitaire refused to help her operate a machine, the Plaintiff reported the unwelcome sexual behavior to one of the Defendant's employees, another trainer named Yolanda McCoy. [Dkt. 20-2 at 76–79]. McCoy directed the Plaintiff to report the issues to another employee named Mourad, and Mourad told her to report the issues to a supervisor named Andrew Lehmenkuler. [Id.]. At Lehmenkuler's direction, the Plaintiff reported the issues to a supervisor named Brenda Niehaus, who in turn brought the Plaintiff to another supervisor named Tammy. [Id.]. At Lehmenkuler's and Tammy's direction, the Plaintiff submitted a written report detailing Solitaire's behavior. [Id.]. Meanwhile, Lehmenkuler summoned Solitaire to another office and immediately demanded a statement from him regarding his account of his behavior. [Dkt. 20-6, Lehmenkuler Deposition, at 31–33]. Solitaire denied engaging in any of the alleged harassment, but Lehmenkuler nonetheless had the two separated and monitored both to ensure nothing further happened. [Id.].

After the Plaintiff filed the written report, Solitaire's advances stopped and he was moved to a different nearby production line in the same building for about a week. [Dkt. 20-2 at 81, 48–49]. Although the sexual advances stopped, Solitaire became standoffish and unhelpful to the Plaintiff. [Id. at 81–83]. The Plaintiff then complained to Lehmenkuler that she was no longer receiving help from Solitaire, that he would tell her to "do it yourself" when she asked for help, and that she believed—

though could not "prove"—he was leaving behind messes for her to clean up. [*Id.* at 82–83]. The Defendant apparently took no formal action regarding the latter complaints about Solitaire's general unhelpfulness, but Lehmenkuler did spend more time in the production area to monitor Solitaire and the Plaintiff after her written report, [Dkt. 20-6 at 33–34], and he had at least one other employee help the Plaintiff clean the messes after she reported them. [Dkt. 20-2 at 82].

Meanwhile, another trainer who was friends with Solitaire, Laquatia Wright, began being rude to the Plaintiff after previously being "kind to" her. [*Id.* at 49, 81, 96]. About a week after the Plaintiff's formal report—so around the time Solitaire returned to the Plaintiff's production line—Wright started being generally hostile to the Plaintiff. [*Id.* at 90–91, 120–21]. One day, after the Plaintiff requested a break at a particular time and Wright disagreed with the Plaintiff taking the break, the Plaintiff walked over to and confronted Wright about her behavior. [*Id.* at 91–92]. The Plaintiff and Wright then got into a an altercation.[1] Wright called the Plaintiff "Indiana white trash" and told the Plaintiff to get out of her face, and in response, the Plaintiff first said "I'm not in your face," then "walked around the table," declared

---

[1] The Plaintiff testified that "there was no physical altercation," that she did not use any racially charged language against Wright, and that after their altercation, she immediately reported the incident to Lehmenkuler. [Dkt. 20-2 at 92–94]. Although there is some doubt about this recitation of the facts, [Dkt. 20-4 at 17; Dkt. 20-10 at 2 (Wright's statement that the Plaintiff "hit [her] hand," said she "better not come to the parking lot," and was chest to chest with her, making physical contact during the argument); Dkt. 20-13, McCoy Letter, at 2 (McCoy's statement that the Plaintiff "push[ed]" Wright's hand, "got in her face," and that both were "bump[ing]" each other and exchanging racially charged language)], the Court takes the Plaintiff's account as true for the purposes of resolving the Motion.

4

"now I'm in your face," and told Wright "I'm sick of you disrespecting coworkers and myself." [*Id.* at 92, 100–01].

The Plaintiff then reported the incident to Lehmenkuler. [*Id.* at 92, 102]. Prior to the altercation, the Plaintiff had never made a complaint about Wright. [*Id.* at 103]. The Plaintiff was sent home that day, was suspended from her position the next day, [*id.* at 92, 95], and was terminated on April 12, 2024, after an investigation about the Plaintiff's behavior during the incident was conducted and witness statements were gathered. [*Id.* at 17, 119, 121–22]. The investigation also covered Wright's behavior during the incident, and she was fired as a result of the altercation as well. [Dkt. 20-4 at 8, 16]. By all accounts, the Plaintiff was fired for getting into an altercation with Wright based on the witness statements that were gathered in the course of the investigation. [*Id.* at 10, 24 ("[T]he physical contact" alleged by witnesses, along with "the verbal" component of the altercation, was "what triggered everything."), 28 ("[P]hysical touching is a terminable offense.")].

The Plaintiff ultimately brought Kentucky state law claims for sexual harassment and retaliation against the Defendant in Boone Circuit Court. [Dkt. 1-1 at 3–4]. The Defendant removed the case to this Court. [Dkt. 1 at 1]. After an opportunity for discovery, the Defendant then filed the present Motion for Summary Judgment. [Dkt. 20].

## II.   Analysis

The Court's role at the summary judgment stage is not to make credibility determinations or resolve any material factual disputes. *Alman v. Reed*, 703 F.3d

887, 895 (6th. Cir. 2013). Instead, all facts must be construed, and all reasonable inferences must be drawn, in favor of the nonmovant. *Id.* Viewing the record in this light, the Court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Conclusory allegations, speculation, and assertions made in pleadings, without more, cannot survive a motion for summary judgment. *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The Court concludes that because the evidence is so one-sided as to essential elements of both of the Plaintiff's claims, no reasonable jury could find in favor of the Plaintiff. The Defendant is thus entitled to summary judgment.

## A. The Plaintiff's sexual harassment claim lacks essential evidentiary support.

The Plaintiff brought her sexual harassment/hostile work environment claim under the Kentucky Civil Rights Act, KRS 344.040. "Courts commonly use Title VII of the Civil Rights Act of 1964 ('Title VII') case law to interpret the KCRA due to the

parallel language in the federal and state Acts."[2]  *Eagen v. Core Specialty Ins. Holdings, Inc.*, No. 5:25-300-DCR, 2026 WL 607270, at *3 (E.D. Ky. Mar. 3, 2026); *see also Gray v. Kenton County*, 467 S.W.3d 801, 805 (Ky. Ct. App. 2014) ("A sexual harassment claim brought under the Kentucky Civil Rights Act ('KCRA') is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart." (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)), *reh'g en banc denied* (2005))).  Under both Title VII and the KCRA, "[t]o establish a prima facie case of a hostile work environment based on sexual harassment, a plaintiff must establish that:  (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) her employer is vicariously liable." *Roundtree v. AVI Foodsystems, Inc.*, No. 2:22-CV-086 (WOB-CJS), 2023 WL 5255705, at *5 (E.D. Ky. Aug. 15, 2023) (citing *Clark*, 400 F.3d at 347).  Even taking the evidence in the light most favorable to the Plaintiff, the fourth and fifth factors are not met here.

The Plaintiff contends that Solitaire's behavior was "sufficiently severe" such that it is actionable, [Dkt. 22 at 8], but she cannot clear the high bar set by binding caselaw to show that her workplace was made objectively hostile by his conduct,

---

[2] Because the "provisions of the KCRA are virtually identical to those of the Federal [Civil Rights Act]," *Jefferson County v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002) (citing *Mills v. Gibson Greetings, Inc.*, 872 F. Supp. 366, 371 (E.D. Ky. 1994)), the Kentucky Supreme Court has held that Kentucky courts "must consider the way the Federal act has been interpreted," *id.* (quoting *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226 (1984)), when applying the KCRA.  Thus, this Court must do the same when sitting in diversity.

which played out over the course of about two weeks.  Neither can she establish that the Defendant is vicariously liable for Solitaire's behavior.  Thus, there is no genuine issue of material fact with respect to the Plaintiff's sexual harassment claim under the Kentucky Civil Rights Act, and so the Defendant is entitled to summary judgment on that claim.

### 1. The Plaintiff cannot demonstrate the existence of an objectively hostile workplace.

A plaintiff alleging a hostile work environment must show that the workplace was objectively hostile or abusive.  *See Kellar v. Yunion, Inc.*, 157 F.4th 855, 872 (6th Cir. 2025) (quoting *McNeal v. City of Blue Ash*, 117 F.4th 887, 904 (6th Cir. 2024)).  This is a "high bar."  *Id.* at 873.  It requires a showing that the employer's conduct "reflect[s] a workplace culture of harassment permeated with hostility towards the protected class."  *Id.*  In other words, the conduct at issue "must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim."  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).  Thus, the key question here is whether the Defendant's workplace was objectively permeated with hostility toward women.  To answer this question, the Court must look at the totality of the circumstances, considering factors like "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance."  *Ammerman v. Bd. of Educ. of Nicholas Cnty.*, 30 S.W.3d 793, 798 (Ky. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  Even taken in the light most

favorable to the Plaintiff, the facts here do not allow the question to be answered in the affirmative.

Kentucky courts and the Sixth Circuit have repeatedly affirmed grants of summary judgment in cases involving similar or more serious behavior than that described by the Plaintiff.[3]   In *Gray v. Kenton County*, for example, the Kentucky Court of Appeals affirmed summary judgment in favor of a defendant in a case where the alleged harassment was arguably worse than the conduct at issue here.   467 S.W.3d at 803–04.  Specifically, a male co-worker was alleged to have engaged in the following acts of harassment against female employees: telling one of the plaintiffs "that with an erectile dysfunction drug he and she could have fun for hours"; asking one of the plaintiffs to "slowly repeat the phrase 'up and down'"; telling multiple plaintiffs that "you can't be the first, but you can be the next," referring to sex; telling

---

[3] *See, e.g.*, *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 298 (6th Cir. 2015) (affirming summary judgment for inappropriate comments, one gesture, and one instance of harasser exposing her breasts); *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (affirming summary judgment when male manager placed a pack of cigarettes inside female plaintiff's tank top and bra strap and made several lewd jokes, including telling plaintiff she had "lost [her] cherry"), *reh'g en banc denied* (2000); *Clark*, 400 F.3d at 344–45  (affirming summary judgment when harassment occurring over the course of two and a half years consisted of vulgar, sexual jokes, two instances of putting a vibrating pager on plaintiff's leg, and one attempt by the harasser to look down the plaintiff's overalls); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 458–59, 464 (6th Cir. 2000) (affirming summary judgment where harassment consisted of supervisor rubbing employee's shoulders, grabbing employee's buttocks, touching employee's chest and making two sexually-laden invitations over the course of several years); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 790–91 (6th Cir. 2000) (affirming summary judgment where harassment took place over about 16 months and consisted of many dirty jokes in the plaintiff's presence, one sexual advance related to the plaintiff's work evaluation; a single reference to the plaintiff as "Hot Lips," and comments about the plaintiff's clothing).

a plaintiff that "he could show her a better time than her husband and ask[ing] where she spent her free time"; touching a plaintiff's leg; telling a plaintiff that "she was beautiful"; telling a plaintiff that "he liked her hair and outfits"; sitting on a plaintiff's desk and inappropriately folding his legs; telling a plaintiff that "she was sexy in the outfit she had worn and could do a slide show for him"; asking a plaintiff out on lunch dates and offering to "show her a good time"; and stroking a plaintiff's hair and referring to her as "the beautiful Bridget." *Id.* This conduct was obviously inappropriate, offensive, and distressing. But the Kentucky Court of Appeals nevertheless held that the plaintiffs had not "presented evidence of conduct sufficiently severe and pervasive so as to create a hostile work environment." *Id.* at 805. Given that the conduct in *Gray* was at least as offensive as—and arguably worse than—the conduct alleged by the Plaintiff in this case, this Court must reach the same conclusion.

To be sure, it is clear that the Plaintiff *subjectively* believed that her work environment was hostile. And that is understandable. From her standpoint, it was undoubtedly an unpleasant experience. But the KCRA is not a "general civility code." *Texas v. EnovaPremier, LLC*, No. 2016-CA-000947-MR, 2017 WL 3129218, at *2 (Ky. Ct. App. July 21, 2017) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). It does not exist to eliminate all unpleasant or offensive conduct from workplaces. Instead, it prohibits conduct that is so severe or pervasive that the workplace can be said to be *objectively* hostile to a protected class. And while the unwelcome behavior identified by the Plaintiff—*i.e.*, "comments and physical contact,

10

including contact with Thornton's bottom," and "allegations that" Solitaire "physically pulled her from her work in an attempt to get her to kiss him" [Dkt. 22 at 8]—was offensive and upsetting, it does not meet the standard for an objectively hostile work environment.  Merely "episodic" incidents of offensive behavior are not enough to be actionable.  *Ammerman*, 30 S.W.3d at 798 (quoting *Carrero v. N.Y.C. Housing Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)).  Likewise, "offhand comments[] and isolated incidents (unless extremely serious)" do not give rise to a valid claim.  *Faragher*, 524 U.S. at 787–88.  Rather, to be actionable conduct under the KCRA, the offensive conduct must be "sufficiently continuous and concerted in order to be deemed pervasive."  *Ammerman*, 30 S.W.3d at 798 (quoting *Carrero*, 890 F.2d at 577).  And, in keeping with the voluminous body of caselaw addressing this issue, it is clear as a matter of law that the conduct at issue here does not rise to that level.  *See Gray*, 467 S.W.3d at 803–05; *see also supra* n.3.

Given the many cases affirming summary judgment for the defendant in light of similar or graver conduct than Solitaire's, the Court concludes that the Plaintiff's work environment was not objectively hostile.  Consequently, the hostile work environment element of her sexual harassment claim fails as a matter of law.

### 2. The Plaintiff cannot establish the Defendant's vicarious liability for Solitaire's behavior.

Separately, the Plaintiff cannot establish the "fifth element" of a sexual harassment claim:  that the Defendant would be vicariously liable for any actionable harassment.  *Clark*, 400 F.3d at 348.  Even assuming that Solitaire's conduct rose to the level of being sufficiently pervasive to create a hostile work environment—which

11

it did not—the Plaintiff would still need to show that the Defendant would be liable for that behavior. And the Plaintiff cannot make that showing.

"[T]here are slightly different standards for evaluating whether the employer as a whole is vicariously liable for the hostile work environment." *Id.* The standard varies "[d]epending upon whether the alleged harasser is a co-worker or a supervisor of the victim." *Id.* In the case of a harassing co-worker, "[a]n employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* (quoting *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999)). If not, then there is no liability. By contrast, an employer *would* be "vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee"; that is, "strict liability is imposed on employers for the harassing conduct of their supervisors." *Id.* (quoting *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999)). So the key question to answer is whether Solitaire was the Plaintiff's supervisor.

The Plaintiff makes no such argument here because she cannot: Although Solitaire was initially tasked with training the Plaintiff on the use of machinery after her orientation, the Plaintiff's own testimony established that he did not have the authority to "write [the Plaintiff] up or fire [her]." [Dkt. 20-2 at 90]. Wright held the same position as Solitaire (*i.e.*, a trainer), and the Plaintiff testified that Wright was not "considered [her] supervisor in any way." [*Id.* at 90]. Indeed, the Plaintiff testified that her supervisor was Lehmenkuler, who is not accused of any harassing

12

behavior. [*Id.* at 54]. So the only way that the Defendant could be liable for Solitaire's actions is if it knew or should have known about them and failed to address them. *Clark*, 400 F.3d at 348.

The Plaintiff cannot make that showing either. She acknowledges, as she must, that the Defendant promptly separated her and Solitaire upon receiving her report of his harassing behavior. [Dkt. 22 at 9 (characterizing this as a "modest action")]. She also acknowledges that the "sexual advances" stopped immediately after her report. [*Id.*]. The testimony that Lehmenkuler monitored the two on the production floor to ensure the alleged harassing behavior did not resume is uncontroverted. *See* [Dkt. 20-6 at 31–33]. And there is no evidence suggesting that Solitaire made more sexual advances after the Plaintiff's report.

The long and short of it is this: The Plaintiff reported alleged sexual harassment to the Defendant, and the Defendant immediately investigated it by taking statements, and then the Defendant took action that ended the harassment— and prevented it from recurring—by separating and monitoring the two. It is hard to imagine what else the Defendant needed to do in this instance. *See Doe v. City of Detroit*, 3 F.4th 294, 304 (6th Cir. 2021) ("If Allen was indeed responsible for these incidents, it appears that moving him, disciplining him, and installing locks and cameras effectively ended the harassment."); *see also Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 51 (6th Cir. 1996) (Because the "plaintiff's own admission" indicated the two weeks of alleged "sexual conduct" ended after the defendant's remedial action, that "action was sufficient to stop it and to relieve [the company] of liability.").

The Plaintiff tries to argue that her sexual harassment claim survives because Solitaire's harassment of her "did not stop" but rather changed "from sexual advances to retaliatory harassment in which Solitaire treated [the Plaintiff] poorly." [Dkt. 22 at 9]. But that latter behavior (which merely consisted of Solitaire refusing to help the Plaintiff at work) is not relevant to the Plaintiff's sexual harassment claim. The dispositive point is that Solitaire's alleged sexually harassing behavior ended as soon as the Plaintiff reported it—apparently because of the Defendant's quick action in separating Solitaire from the Plaintiff and monitoring them. Again, that ends the inquiry. *Compare Hafford*, 183 F.3d at 511, 513–14 (concluding that "a jury could find . . . that Hafford's employer knew of, and failed to respond appropriately to the behavior directed toward Hafford" where the employer "did not timely respond to the anonymous phone threats" and Hafford "was reprimanded for attempting his own investigation."), *with Stevens v. USPS*, 21 F. App'x 261, 264 (6th Cir. 2001) (affirming no liability because the employer had no reason to know of alleged harassment before the employee reported it and because a "three-day delay [on the employer's part] does not constitute an unreasonable failure to take prompt corrective action"), *and Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 684, 686 (6th Cir. 2005) (affirming no liability where "there was no evidence that [the defendant] generally tolerated sexual harassment or did not take it seriously," where defendant "had policies explicitly prohibiting workplace sexual harassment and that it distributed materials informing the employees of these policies," where the defendant investigated the employee's complaint, and where the defendant "immediately suspended" the accused harasser).

14

The Plaintiff also attempts to argue that "there was no investigation and no disciplinary action taken in response to [the Plaintiff's] complaint of harassment." [Dkt. 22 at 9]. But this is belied by the uncontroverted record. Again, the Defendant separated Solitaire from the Plaintiff, which was effective in bringing the alleged harassment to an end—even according to the Plaintiff herself. [Dkt. 20-2 at 81]. And contrary to the Plaintiff's argument, the record is clear that the Defendant did, in fact, investigate the Plaintiff's complaint by immediately summoning Solitaire to meet with Lehmenkuler and provide a statement containing his version of the events while the Plaintiff was writing her own statement. [Dkt. 20-6 at 31–33]. Such immediate action can hardly be construed as "no investigation," let alone knowledge of charged sexual harassment and failure to implement prompt and appropriate corrective action.

The Plaintiff finally argues in the alternative that "there is some evidence that [the Defendant] knew or reasonably should have known that Solitaire had harassed other female employees." [Dkt. 22 at 9]. Even if true, that point is irrelevant. The Defendant brought Solitaire's actions against the Plaintiff to a swift end as soon as it became aware that the Plaintiff was being targeted. As noted above, that is enough to avoid liability. *See, e.g.*, *Fleenor*, 81 F.3d at 51. Because no reasonable jury could conclude otherwise on this record, the Plaintiff cannot establish the fifth element of her sexual harassment claim as a matter of law.

**B. The retaliation claim likewise lacks essential evidentiary support.**

There is likewise no genuine issue of material fact with respect to the Plaintiff's retaliation claim under the Kentucky Civil Rights Act. The Plaintiff contends that

15

she was suspended and then terminated in retaliation for making complaints of sexual harassment. [Dkt. 22 at 10]. But the evidence says otherwise.

A retaliation claim under the Kentucky Civil Rights Act is "evaluated under the same standard [used] to evaluate federal Title VII claims." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014). The Plaintiff appears to concede that there is no direct evidence of discrimination in this case. [*See* Dkt. 22 at 9–10]. Consequently, "the Court must analyze [the] [P]laintiff's retaliation claim under the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*." *Redmond v. Bell Cnty. Bd. of Educ.*, 804 F. Supp. 3d 740, 748 (E.D. Ky. 2025) (citing 411 U.S. 792 (1973)).

Under that framework, the Plaintiff "must first make a prima facie case of retaliation by showing (1) she engaged in a protected activity; (2) the defendant knew of her protected activity; (3) the defendant took an action that was "materially adverse" to [the Plaintiff]; and (4) a causal connection between the protected activity and the materially adverse action." *Id.* If the Plaintiff succeeds in making out a prima facie case, the "burden then shifts to the [Defendant] to provide legitimate, non-retaliatory reasons for the adverse action at issue." *Id.* at 749. Once the Defendant "provides such reasons, the burden shifts back to [the Plaintiff] to show that the proffered reasons were pretextual." *Id.* "Through each phase of this burden-shifting framework, the burden of persuasion remains on" the Plaintiff. *Id.*

16

### 1. The Plaintiff cannot establish causation or pretext.

The Plaintiff primarily relies on temporal proximity to establish the causation element of her retaliation claim.[4]  But "[t]emporal proximity alone generally is not sufficient to establish causation." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020).  "Exceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Id.* at 449.  For instance, this is not a case where the adverse employment action occurred "the very next day." *See Montell*, 757 F.3d at 506.  In cases like this one, where about a month passed between the protected activity and the adverse employment action, "it is up to [the Plaintiff] to provide other indicia to support a causal connection." *See Kenney*, 965 F.3d at 449 (contrasting next-day adverse employment action with 75-day delay between protected activity and adverse employment action).  The Plaintiff cannot do that.[5]

---

[4] The Plaintiff points to *Asmo v. Keane, Inc.* to suggest that a delay between a protected activity and an adverse employment action as long as two months is itself enough to support the causation element. [Dkt. 22 at 10–11 (citing 471 F.3d 588, 593 (6th Cir. 2006)].  But the Sixth Circuit later cautioned against such simple line-drawing: "'In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn,' and we assess each case individually." *Williams v. Zurz*, 503 F. App'x 367, 372 (6th Cir. 2012) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)).  The Sixth Circuit concluded in *Williams* that, under the totality of the circumstances, "the one-month temporal proximity" alone "does not show causation." *Id.* at 373 (affirming grant of summary judgment).  So, too, here.

[5] Apparently recognizing her inability to satisfy the causation element of the *McDonnell Douglas* framework, the Plaintiff pivoted to rely on what she calls a "recent Opinion in *Hittle v. City of Stockton*, 145 S.Ct. 759, 221, L. Ed. 425 (2025)" to argue that applying the *McDonnell Douglas* framework is unnecessary. [Dkt. 22 at 10].  She says "Justice Thomas cautioned that the *McDonnell Douglas* burden-shifting framework is not a substantive legal standard that a plaintiff must establish to survive summary judgment." [Dkt. 22 at 10].  However, what the Plaintiff suggests is an opinion of the Supreme Court authored by Justice Thomas is, in fact, a dissent

17

As noted above, the Plaintiff got into an altercation with Wright at work. All of the evidence in this case—deposition testimony and documentary evidence alike—indicates that the Plaintiff was fired because of that incident. Although the Court takes it as true that the Plaintiff did not *actually* make physical contact with Wright, it is undisputed that witnesses *reported* physical contact and heated language to the Plaintiff's supervisors. [Dkt. 20-4 at 8, 24, 28]. There is likewise no dispute that the altercation happened at work and was disruptive. By contrast, there is not one iota of evidence in this case tending to suggest that the Plaintiff's protected activity of reporting harassment was the root cause of her suspension or termination—and the Plaintiff points the Court to none. Thus, it is clear from the record that no matter whether the Plaintiff actually made physical contact with Wright, it was the altercation and the *reports* of physical contact and heated language that led to her termination, not the Plaintiff's earlier report of harassment. Simply put, there is no evidence in the record that would support an inference of retaliation.

This would be a different case if the Plaintiff were fired and Wright were not. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("[E]vidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation."). But in this case, both employees involved in the altercation

---

from the denial of *certiorari*. *See* 145 S. Ct. 759, 759 (Thomas, J., dissenting). Because Justice Thomas's dissent did not command a majority or a plurality of the Supreme Court, this Court remains bound to apply the *McDonnell Douglas* framework here.

were fired after an investigation. In light of the substantially similar treatment between the Plaintiff and Wright and the dearth of any indication that the Plaintiff's report of sexual harassment played any role in her suspension or termination, the Court concludes the Plaintiff fails to establish causation for her retaliation claim.

Despite all this, the Plaintiff argues that causation may somehow be satisfied by the conflicting evidence about whether the decisionmakers behind her suspension and termination were aware of her sexual harassment report. [Dkt. 22 at 11–12]. But the mere *possibility* of the decisionmakers' awareness of her report, standing alone, does not provide any "indicia to support a causal connection" between that report and their decision to suspend or terminate her. *See Kenney*, 965 F.3d at 449. This line of conclusory allegation, speculation, and bare assertion cannot stave off summary judgment. *Hartsel*, 87 F.3d at 801. But even if it could, "mere awareness, while essential to making out a prima facie case of discrimination or retaliation, is not enough to show pretext." *Welch v. Heart Truss & Eng'g Corp.*, No. 24-1584, 2025 WL 2828895, at *6 (6th Cir. Oct. 6, 2025). "Otherwise, every plaintiff who established a prima facie case—which includes a showing that the defendant knew the plaintiff engaged in protected activity—would necessarily satisfy the pretext inquiry." *Witham v. Intown Suites Louisville Ne., LLC*, 815 F.3d 260, 264 (6th Cir. 2016).

The upshot is that even if the Plaintiff somehow could clear the causation hurdle on this record, the Court concludes that her arguments would still fail to establish a genuine issue of material fact about whether the Defendant's proffered legitimate, non-discriminatory reason for firing her (*i.e.*, the altercation, which

violated company policy [Dkt. 20 at 24–25]), was mere pretext on this record.  The result is the same—her retaliation claim fails.

### 2. The cat's paw theory of liability cannot save the Plaintiff's retaliation claim.

As a last-ditch effort, the Plaintiff invokes the "cat's paw theory of liability." [Dkt. 22 at 12 (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011))].  A plaintiff alleging liability for retaliation under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub*, 562 U.S. at 415).  But cat's paw liability does not replace the prima facie test.  *Id.* at 379–80 (A plaintiff asserting cat's paw liability "must satisfy the requirements of the *McDonnell Douglas* framework and prove that the decisionmaker was the cat's paw of a biased subordinate.").

As explained above, the Plaintiff cannot satisfy the *McDonnell Douglas* framework's requirements.  But the Plaintiff nonetheless argues that causation is satisfied because Lehmenkuler "escalated and exaggerated the conflict between" the Plaintiff and Wright "for retaliatory reasons."  [Dkt. 22 at 12].  She offers no support for that bare assertion other than to argue that Lehmenkuler did not escalate the Plaintiff's sexual harassment report, but he escalated the altercation between her and Wright and reported that the Plaintiff "hit" Wright, so there must be "suspicion as to his motives."  [*Id.* at 13].

The argument unravels for three reasons.  First, Lehmenkuler *did* escalate the Plaintiff's report of sexual harassment up the chain of supervisors.  Recall that he

20

told the Plaintiff to go to Niehaus, who then directed the Plaintiff to go to Tammy, who in turn directed the Plaintiff to file a written report.  [Dkt. 20-2 at 76–79].

Second, the documentary evidence the Plaintiff relies on is not at all what she describes in her Response:  Lehmenkuler's report about the altercation makes it plain that he "*was not there during the incident*, but [Wright] is *claiming* that [the Plaintiff] hit her, and [the Plaintiff] is *denying* it," that he "fe[lt] that we need to pull the camera footage" to "better understand[] . . . what actually happened," and that he believed "there are plenty of witnesses."  [Dkt. 20-11, Wright Letter, at 2 (emphases added)].  Far from planting seeds of bias for retaliation, Lehmenkuler plainly reported the factual accounts he gathered, suggested that more information needed to be collected, and—notably—did not recommend that the Plaintiff be fired or disciplined.  [*Id.*]; *see also* [Dkt. 20-6 at 30 ("Q:  Did you ever make a recommendation that [the Plaintiff] be terminated?  A:  I don't believe so.  No."), 37 ("I have no idea why she was terminated")].    The  Plaintiff's  claim  that  Lehmenkuler's  e-mail  "intentionally exaggerated allegations of physical violence to increase the likelihood of significant disciplinary action" against the Plaintiff strains credulity.  [Dkt. 22 at 13].

The third reason to reject the cat's paw argument is far simpler:  The Plaintiff "may not point to the bare possibility that a jury might *disbelieve* the [Defendant's] testimony; she must present *proof of her own* that creates a 'genuine dispute as to any material fact.'"  *Witham*, 815 F.3d at 265 (second emphasis added).  This she has not done.  The Sixth Circuit has rejected cat's paw liability when, as here, the plaintiffs "did not present any evidence that [the decisionmakers] were manipulated

21

by a subordinate with discriminatory animus." *Caldwell v. Gasper*, No. 22-1031, 2022 WL 16629161, at *10 (6th Cir. Nov. 1, 2022). That is, the "Plaintiff cannot rest solely on her belief that [Lehmenkuler] was biased against her to proceed under the cat's paw theory of liability." *Turnbow-Avery v. Tuling*, No. 1:23-CV-571, 2025 WL 2051758, at *17 (S.D. Ohio July 22, 2025), *appeal docketed*, No. 25-3638 (6th Cir. Aug. 14, 2025). But without any evidence tending to suggest bias, that is all the Plaintiff does here. In the absence of any evidence that the decisionmakers who decided to suspend and terminate the Plaintiff were manipulated by Lehmenkuler, there is nothing for the jury to decide.

In short, the Plaintiff's invocation of the cat's paw theory provides no safe harbor. Her retaliation claim still fails either for failure to establish causation or, in the alternative, for failure to demonstrate that the legitimate reason for her termination was mere pretext.

## III.    Conclusion

For these reasons, it is hereby **ORDERED** that the Defendant's Motion for Summary Judgment, [Dkt. 20], is **GRANTED** as to all of the Plaintiff's claims. Further, the trial in this matter and all deadlines are **VACATED**. A separate judgment will be entered consistent with this opinion.

Dated this 20th day of March, 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky

22